| 23 | 337 |
| 48 | 238 |

## BOYCE vs. BOYCE.

1. If a husband who has ample means takes his wife, with whom he has for years been living in a city in discord and bitter contest, to a retired country tavern, against her wishes and protest, and, in her absence, leaves the place, with all his baggage, without notice to or knowledge by her of the place to which he has gone, and without any notice by him to her whether he has made provision there or elsewhere for her support, and leaves her thus without money and without any one in the house or its vicinity, for companions, except the tavern-keeper and his wife, it is such abandonment and separation as, if without justifiable cause, will entitle her to a decree for support and maintenance.

2. A wife is bound to accompany her husband to such place as he may, as head of the family, in good faith determine to remove to for habitation or business, provided it does not unreasonably banish her from all society and comforts of civilized life. But a husband has no right, as a punishment for contumacy or bad temper, to banish his wife to a lonely place, without friends or society or her accustomed comforts, when he does not stay with her and share her privations.

3. By law, a man is not justified in deserting his wife because she is extravagant or lazy, or swears, or uses coarse language, or is sickly, fretful

or of violent temper, or because she wreaks her temper or showers her coarse or profane language upon him, and thus makes his life uncomfortable. These are not crimes, but infirmities and defects, which, in consideration of law, a husband undertakes to put up with when he takes his wife for better or worse.

Argued upon final hearing, on pleadings and proofs.

*Mr. W. B. Williams,* for complainant.

*Mr. Gilchrist,* Attorney-General, and *Mr. McGill,* for defendant.

THE CHANCELLOR.

This suit is by Mrs. Boyce against her husband, for support and maintenance, on the ground that he has separated himself from her, and neglected to maintain and provide for her. It is founded on the tenth section of the divorce act, which declares " that in case a husband, without any justifiable cause, shall abandon his wife, or separate himself from her, and refuse or neglect to maintain and provide for her, it shall and may be lawful for the Court of Chancery to decree and order suitable support and maintenance to be paid and provided by the said husband."

The chief, if not the only question, is whether Mr. Boyce, without justifiable cause, has abandoned his wife, or separated himself from her, and refused or neglected to provide for her maintenance. This is the real issue. A vast amount of testimony has been taken on both sides, relating to the conduct of the parties during their married life, most of which bears only indirectly, if at all, upon this issue.

Mr. Boyce, a widower fifty-six years of age, was married to the complainant, a single woman of twenty-six, October 13th, 1857. He was worth over $30,000, and engaged in business in New York as a chair-maker, and resided in a comfortable and well-furnished two-story house in Jersey City. The complainant was the daughter of a farmer of very moderate means, residing at Branchville, in Somerset county. Mr. Boyce had a daughter Louisa, then nine years.

old, residing in his family.   His son Isaac was married, and lived on Staten Island.   Another daughter, Mrs. Van Dyke, had died at his house a few months previous, leaving a son of tender years.   His first wife died some ten months before this marriage.   The complainant, at the request of Mr. Van Dyke, the defendant's son-in-law, who was her cousin, and resided with Mr. Boyce, stayed at the house of Mr. Boyce as a companion for Mrs. Van Dyke during her last illness, and until her death.

After the marriage, Mr. Boyce took her to his house in Jersey City:   They had one child, born in July, 1859, which died March 4th, 1861.   He relinquished his business as a chair-maker, in February, 1860, on account of ill health. He broke up housekeeping April 29th, 1864, selling out his furniture and renting the house.   They stayed in Jersey City until May 18th of that year, when they went to board at a place called Rockland Lake, or Slaughter's Landing, on the shore of the Hudson river below the Palisades, at the place where the Rockland Ice Company let down their ice from the ice-houses on Rockland Lake, which is on the top of the hill, and from which they ship it to New York.   Here they stayed until Monday, June 27th, when Mr. Boyce, during the absence of his wife on a visit to Jersey City, left the house, with his trunk, and went to Manhasset, on Long Island, where he stayed until October.   He did not let Mrs. Boyce know that he intended to leave, or ask her to accompany him, or let her know, at any time, where he had gone. The question is whether this, under the circumstances under which it took place, was a separation of himself from her without justifiable cause, and without providing for her maintenance.

The acts that constitute the alleged separation or abandonment took place within a few days.   But the relation of the parties to each other at that time is important as giving character to these acts, and makes it necessary to consider their conduct to each other, and the history of their married life, for that purpose.   That life had been, for a large part of it,

filled with unhappy difficulties, bitter quarrels and recriminations, accompanied with some personal violence on both sides. Mrs. Boyce had a quick and violent temper, which, if it was not uncontrollable, she did not control; she indulged in much violent, and even coarse abuse of her husband, which was not justified by hardly any provocation. She exercised with severity her peculiar power of vexing and tantalizing him; I think more so than was justified by retaliation or self-defence. A more rational and prudent course of conduct towards him, if all his alleged faults are real, would probably have made her life with him more happy, and might have averted the issue of which she now complains.

This conduct on her part does not appear during the first year of their married life, and was not exhibited to any great degree until after the death of their child. While they were at housekeeping, Mrs. Boyce appears to have discharged the duties of a wife, in the household affairs, faithfully and well. She treated his daughter with great attention and kindness, so that she became devotedly attached to her, and she is accused by her husband of stealing his child's affections from him.

On the other hand, Mr. Boyce treated his wife, from the commencement of their union, unkindly, and in several instances with great want of feeling, and with harshness and cruelty. I do not refer to physical violence; the instances of that, which are proved, are comparatively insignificant. By this observation, I do not mean to concur in the opinion which he testifies was given him by some one that he calls his counsel, that he was entitled to chastise her much more severely than he did—an opinion which I am sure no counselor of this court would ever degrade himself by giving. In a state so far in advance as to prohibit, absolutely, a teacher from inflicting corporal punishment upon a scholar in any school, such a relic of barbarism as the right of a husband to chastise his wife, for any cause, can have no existence.

One of the instances of cruel treatment that I refer to, was on the eve and day of their marriage. The facts are testified

to by her, but they are not contradicted. They were not introduced on her part, but were drawn out by a harsh question put to her on his part.

They were to be married at nine o'clock in the morning, and to have taken a wedding tour; he was to have brought her, as bridal presents, a gold ring and a gold watch. On the evening before the marriage day, he came to her father's house where they were to be married, and, upon her speaking of her trunk being packed, expressed surprise, and said that they were not to go on a wedding journey, and alleged as his excuse, the tightness of the money market, consequent on the well known panic of 1859; he brought neither ring nor watch. He had met with no loss, and had money in the banks and in his pocket. His excuse was evidently a pretence and evasion. This to her must have been a great disappointment and mortification. She was the daughter of a plain farmer, but evidently superior in many respects to most of her class, and to the man she was about to marry; and she had, no doubt, looked forward to these promised gratifications and others which his wealth could afford, as compensation for marrying one so much older than herself. Here his promises and wealth both failed her. He was both faithless and unfeeling. It was the first exhibition of the parsimony and meanness that were the burden of her reproaches.

Next morning, when she asked how he felt, he said, not well; he had not slept; he had been thinking about their conversation last night, and wondering whether they would be happy. This to the woman who was in two hours to be his wife, was more than unfeeling, it was harsh and cruel; it brought tears. Upon her saying she ought not after that to marry him, he asked her forgiveness, and protested it would make him the most miserable of men. She forgave this, and married him. It was hardly possible for her to forget it. The breach of faith may have been caused, if it was not excused, by his economical spirit; but the scene in the morning appears like a contrived heartless and cruel stab.

Again, her child died from some injury by falling off a

lounge, where she had placed it. Afterwards, he told her and others, in her presence, that she had laid the child on the lounge purposely, that it might fall off and be killed. This to a mother grieving for the loss of her child, and who would reproach herself and feel miserable because she had placed the child in peril, whether there was any negligence in it or not, was a most unfeeling, malignant, and cruel accusation. No personal violence of which he was accused, approaches it in cruelty. It is shown by two witnesses; he nowhere contradicts it.

He ordered her sister, from a distant town, who was visiting her, to leave his house, and attempted to seize her and put her out. He ordered a friend of hers from Trenton, whom he had visited in company with his wife, when she was visiting his wife, to leave his house, and when his wife opposed it, brought a policeman, and when he refused to put her out, brought another with some warrant for the purpose.

He called her a fat, lazy thing, and spreading out his dressing-gown walked up and down the room, mimicking her gait in the presence of her servant.

In August, 1863, he published in the city papers a notice, warning every one to trust no one on his account, and explained to her and merchants with whom she dealt, that it was intended for her. This was wanton, as it does not appear that she had ever contracted any debt of consequence, without his approval and consent.

His conduct in expelling her from his bed, because she staid out on one night until after ten o'clock, and disturbed his sleep by coming to bed at that time, was harsh and unjustifiable. His conduct in not allowing her, after 1860, to purchase the family stores, in dealing out money to her in parcels of ten, twenty-five, and fifty cents, and requiring her then to tell what it was to be expended for, was neither unlawful or cruel, but it was calculated to provoke, though it did not justify many of the epithets which she is said to have bestowed on him; and his whole treatment and conduct was calculated

to irritate and provoke a quick and uncontrolled temper to such outbreaks as she indulged in. But it by no means justified them. It is not necessary here to express an opinion as to which of these parties was to be most blamed for these unhappy discords. The fact that his daughter, who was sixteen years of age at the separation, and who saw the conduct of each to the other, constantly and intimately until then, warmly took sides with her stepmother against her father, throws more light on this question than can be derived from evidence so contradictory as much of this is. Her letters, written during the last three months, show with certainty what her opinion then was, and she must have had more obliquity of moral perception and deficiency of natural affection than I can conceive possible in her case, if the conduct of Mrs. Boyce was such as her husband and his witnesses state, and unless her father's conduct had been strongly marked by harshness and ill-treatment.

With this light as to the relations of the parties, we can better consider the facts which constitute the separation.

It is shown that before he left Rockland Lake, Mr. Boyce desired a separation. He asked her father, a year before this, to take her home, and offered to pay him anything he should ask for her board. He told Mrs. McLaughlin, before they left Jersey City, that he was determined to separate. He told Mrs. Plum, that he wanted her to take $400 a year, and live separate. He offered her this in Mrs. Plum's presence. After they went to Rockland Lake he got Mrs. Ward to offer her $500 a year to separate. He told several that he could not live with her, could not get along happily with her, and that it was his reason for breaking up housekeeping. He advertised his furniture for sale, and offered his house to let without consulting her, without her consent, and without her knowledge, until a few days before the sale. The sale was on Friday, the 27th of April; the only bed left in the house that night was his own, from which she had been expelled eight months before. He provided no place for her or Louisa to sleep, but told them, when asked, to go where

they pleased. He provided no place for her until Sunday. He had determined to go to Ackerson's, at Rockland Lake. He never consulted her about the place where they were to go, and she insists that he did not tell her where he was going until two or three hours before they started to go there, on May 18th. He insists that he told her before the sale of the furniture. The evidence is very conflicting, some of the witnesses are, at least, very much mistaken. The weight, if estimated by the number of witnesses, is on the side of Mr. Boyce; but notwithstanding this, I am much inclined to turn to the letter of Louisa, of May 17th, rather than to Louisa's recollection, or that of other witnesses. The explanation of that letter can satisfy no one, and I do not believe that she could, at that time, have contrived this letter if she had known where her father was going to, before she left Jersey City on the 14th of May. But this point is not of any vital importance. The evidence is abundant to show that Mr. Boyce intended to take his wife to a place that he chose, without consulting her wishes, or asking her assent, which is the only object to be attained by this proof.

When Mrs. Boyce arrived at the tavern kept by Ackerson she was dissatisfied, and protested against staying there; her husband persisted. The house was on the shore of the Hudson, below the hill or rocks, here more than one hundred feet high; the shore was without cultivation, grass, or herbage; there was no other dwelling-house below the hill; on one side was a yard for building boats, on the other a range of sheds and a pig pen; the shore was about four hundred feet from the river to the hill; in front a pier, to which the company's ice boats came for their cargo. The tavern was a two story frame building. When they arrived there were no boarders but the workmen in the boat-yard, who took their meals there. Mrs. Ackerson did all her own work, and had no servant; but one was got soon afterwards. The rooms were small, illy lighted, and poorly furnished. It was, in fact, a forlorn, desolate place, on the west shore of the Hudson, below the rocks, without a single habitation on

that side in sight. It was a place where no one would resort or stay, except amateur fishermen or boatmen, or persons whose straitened circumstances would compel them to put up there. The whole aspect of the place was such that no one can doubt, in the relation of these parties, that Mr. Boyce brought his wife there to mortify and humble her, whether he told her so or not. That he did, she asserts and he denies.

While they continued at Ackerson's their conduct towards each other seems, in the main, to have been comparatively amicable. They went several times to Jersey City, and he made arrangements with Mrs. Ward, residing there, for the complainant to stay at her house when she came to Jersey City. He procured or paid for some clothing for her. They had a number of disputes and quarrels, in one of which personal violence was used; for this she had him arrested, tried, and fined.

On Thursday, the 23d of June, Mrs. Boyce wanted to go to Jersey City. She says, he had promised her that she should go on that day. When the day arrived he opposed it, and told her not to go, but to wait until Monday and go with him. He refused to give her money to pay her expenses, and before the boat arrived, in which she must go if she went, he walked out of the way. She borrowed a dollar from Mary Caton, the servant, and went. She had told Mr. Boyce, as she says, that she would be back on Saturday, or if not, she would see him on Monday, when he came down. She did not return on Saturday.

On Monday morning, June 27th, Mr. Boyce left Ackerson's for New York. He took with him all his clothing and other goods, packed in his trunk, except an old hat and an empty cigar box, which he left in his room, and one shirt and some small articles which were being washed, and which he requested Mr. Ackerson to bring to him at New York. He did not tell any one where he was going, or when he would return. He left no word or message for his wife on her return. His trunk was taken to some place in New York,

to which, sometime that week, Mr. Ackerson brought his shirt and some other small articles. On the same day, or the next day at farthest, as I am satisfied from the evidence, he went to Manhasset, Long Island, and engaged board for himself, of B. H. Smith, a farmer living there. He engaged board there for himself alone; never mentioned his wife to Mr. Smith, who did not know that he had a wife. He returned to New York on Friday, July 1st, and staid there, or about the city, until July 5th, when he went back to Smith's, where he continued to board until some time in October. When he left Ackerson's he knew that his wife's clothing and her trunks were there, and that she expected to return. He paid for her board and his own up to that morning. He paid to Mary Caton the borrowed dollar, and never came back there himself to board, and never sent any note, message, or directions to his wife as to where she was to stay, or informing her that he had made any provision for her.

Mrs. Boyce returned to Ackerson's on the morning of Wednesday, July 29th. She says, that not seeing him at Mrs. Ward's on Monday, she called, on Tuesday morning, on the captain of the steamboat, who informed her that her husband came down with him on Monday, and said that he did not intend to return to Rockland Lake. She went to Ackerson's on Wednesday, and on arriving inquired of Mrs. Ackerson for her husband. Mrs. Ackerson told her that he had left, bag and baggage. On inquiring if he had left any word for her, she was told he had not. Mrs. Ackerson went to the bar-room to her husband, and returned with the answer, that Boyce had left no word for her with him. This is the statement of that occurrence, as stated by Mrs. Boyce and Mary Caton, who was present. Mrs. Ackerson states it differently, in some respects, but her statement is not so clear or consistent, and I prefer to rely on that of Mary Caton and the complainant. After all, the main difference is, as to the words, bag and baggage, which are not very material, as he had left with his trunk and all his effects. That he left no

message for her is beyond question, as he himself testifies positively, that he did not.

She stayed there that night, packed her clothes in her trunks, and went to New York the next morning. Some days afterwards, having borrowed some money, she went for her trunks. The next morning, as Ackerson and his wife were carrying down her trunks (they had, in the meantime, discharged their servant), she offered to pay him her bill. He told her there was nothing to pay, that Mr. Boyce had provided for the payment. Upon this she said that she would not then take away her trunks. Ackerson then told her, that Mr. Boyce said he would pay for her board as long as she stayed there. She left her trunks, went back to the city, and, in a few days, returned with a female friend, who stayed there with her that night. The room formerly occupied by her was then occupied by a stranger and his wife, and Mrs. Boyce and her friend slept in another room. The next morning she left with her trunks. Up to that time she was not informed, nor did she know, where Mr. Boyce was. The Ackersons did not inform her, nor did they know where he was. Mr. Boyce did not communicate with her in any way, until after she had taken board at Mrs. Henry's, in Jersey City. He refused to pay her board there, and to pay for clothing which she bought of merchants in Jersey City. The evidence as to some of these facts, is somewhat contradictory, but on careful consideration of it, I have been brought to the above conclusion as to the facts.

From these facts the conclusion is inevitable, that the defendant did separate himself, and intended to separate himself, from his wife. That when he left he intended not to come back to her, or to that place, and that his manner of leaving, in her absence, without advising her of his intentions, and concealing from her and the Ackersons the place to which he had gone, was designed to produce the impression on her that he had abandoned her, and to influence her conduct. He had before, expelled her from his bed; had, against her will, broken up housekeeping; and had taken her, without

consulting her, and without her consent, to a place disagreeable of itself, such as he knew must be repulsive and intolerable to her. He then privily deserted her, leaving her with no companion, or any one within reach suitable for companionship, at an ordinary country tavern, with no money to pay her board, and no assurance from any one, that her board was provided for until her second return from New York. These facts constitute a separation from his wife, and an abandonment of her. He did this without providing for her maintenance and support. The arrangement he made with Ackerson was not such provision as satisfies the statute.

The wife is bound to follow her husband when he changes his residence, even without her consent, provided the change is made by him in the *bona fide* exercise of his power, as head of the family, of determining what is the best for it. Even this may have its limits, and it may be questioned, whether a husband has a right to require his wife to leave all her kindred and friends, and follow him to Greenland or Africa, or even to Texas, Utah, or Arizona. Clearly, he has no right to take her to such places as a punishment for her disobedience, extravagance, or ungovernable temper. No husband has the right to take his wife to any such place where he does not intend to reside with her himself, and compel her to stay there at his pleasure, alone without him. Else he might take a wife who had offended him, from a comfortable or luxurious home among the most cultivated inhabitants of the state, to a hut in the pines of West Jersey, among charcoal burners, fishermen, and furnacemen, and by placing her in a comfortable log cabin, in a pure, healthy atmosphere, with wholesome, well-cooked, nutricious food, while he himself went to Saratoga or Niagara, or returned to his luxurious home, and be held to have complied with the law by thus providing for her support. The defendant had no right to annex, as a condition to the provision for the support of his wife, that she should stay without him or any companion, at a place like Ackerson's tavern. Besides, if it had been a

proper place, the mere provision for board and lodging is not a sufficient provision. She had no money at her command to employ a physician, to send for medicine, or to get away from this place to her relatives, if they should be sick or dying, or to go anywhere for the necessaries of life, or for any society or enjoyment.

There is no justifiable cause for the abandonment shown. I shall not consider whether her ungoverned temper, her frequent outbursts of passion, the abusive and scurrilous epithets bestowed on him, and her perseverance in tantalizing him, were not occasioned or justified by his harsh treatment of her in the instances before mentioned, and others. But if they were not provoked by him, they are not crimes, but the infirmities and defects which, in consideration of law, a husband undertakes to put up with when he takes his wife for better or worse. In morals, it may be different. A man cannot desert his wife because she is extravagant, or lazy, or swears, or uses coarse language, or is sickly, fretful, or of violent temper; or because she wreaks her temper, or showers her coarse or profane language upon him, and thus makes his life uncomfortable. Incompatibility of temper has not as yet, in New Jersey, been made by law a ground of divorce or for desertion.

In my opinion, the evidence shows that the defendant has, without justifiable cause, separated himself from his wife, and has neglected to maintain and provide for her; and a decree must be made for a suitable support, to be paid and provided by the defendant for her. To enable the court to determine what is a proper amount to be paid for that purpose, it must be referred to a master, to ascertain and report what is the amount of the defendant's estate, and of his income from that and all other sources.